# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:07CR00029 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **THE PURDUE FREDERICK** | ) | By: James P. Jones |
| **COMPANY, INC., D/B/A THE** | ) | United States District Judge |
| **PURDUE FREDERICK COMPANY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Chilton Davis Varner, Stephen B. Devereaux, Eric M. Wachter, and Merritt E. McAlister, King & Spalding LLP, Atlanta, Georgia, and Wm. W. Eskridge, Penn, Stuart & Eskridge, Abingdon, Virginia, for The Purdue Frederick Company, Inc.; Mitchel T. Denham, S. Travis Mayo, and C. David Johnstone, Assistant Attorneys General, Office of the Attorney General, Frankfort, Kentucky, on behalf of the Attorney General of Kentucky.*

In this criminal case, concluded over six years ago, defendant The Purdue Frederick Company, Inc. ("Purdue"), requests the court to enjoin the Attorney General of Kentucky (the "Attorney General") from litigating certain claims on behalf of the Commonwealth of Kentucky (the "Commonwealth") in a civil action pending in that state's courts.[1] Purdue argues that its guilty plea in this case, as

---

[1] Initially, Purdue also moved to enjoin Pike County, Kentucky, which had jointly filed suit with the Commonwealth in state court. Pike County has since consented to an order dismissing from the state court action any of its claims that might have been relevant to the issues Purdue has raised in its motion for an injunction. Accordingly, Purdue withdrew its request for relief against Pike County, and I will focus exclusively on the availability of injunctive relief against the Attorney General.

well as an associated civil settlement it reached with the federal government over Medicaid payments, conclusively determined certain aspects of the Attorney General's suit in state court. Purdue contends that the Attorney General's attempt to introduce evidence as to damages for claims that have already been resolved threatens the integrity and finality of the outcome over which this court presided in 2007, warranting the issuance of an injunction pursuant to the All Writs Act, 28 U.S.C.A. § 1651 (West 2006). The Attorney General[2] opposes the motion, asserting among other things, that such an injunction would exceed the power of this court under the Anti-Injunction Act, 28 U.S.C.A. § 2283 (West 2006).

For the reasons that follow, I will deny Purdue's request for an injunction.

## I. BACKGROUND.

The facts surrounding Purdue's motion are matters of record and are undisputed.

Purdue manufactures OxyContin® Tablets ("OxyContin"), a prescription opioid pain medication. Between 2002 and 2007, the United States Attorney for this district, along with other state and federal authorities, conducted an extensive investigation into Purdue's conduct in marketing and promoting the sale of this

---

[2] The Attorney General is the plaintiff in the suit in state court. In its motion, therefore, Purdue seeks to enjoin the Attorney General. He has responded, however, in the name of the Commonwealth. Despite this possible dissonance, I will review the Attorney General's arguments as though they had been filed on his own behalf.

drug. This investigation culminated in Purdue's guilty plea in this court to an Information charging it with misbranding OxyContin with the intent to defraud or mislead a felony under the Food, Drug and Cosmetic Act. 21 U.S.C.A. §§ 331(a), 333(a)(2) (West 1999 & Supp. 2013).[3] In connection with the plea, Purdue entered into a written Plea Agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), in which it agreed to pay substantial monetary amounts totaling $600 million, of which a portion — $160 million — was to settle state and federal health care program claims pursuant to a Civil Settlement Agreement.

As a part of its plea, Purdue consented to an Agreed Statement of Facts. The government alleged, and Purdue agreed, that Purdue had marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause patients to develop tolerance or experience withdrawal than other narcotic pain relievers. Purdue agreed that it had made these representations to its own sales personnel, as well as to healthcare providers, while knowing that they were not true, and thereby violated federal law.

Before accepting Purdue's Plea Agreement as submitted, I ordered both Purdue and the government to submit additional documents and answer a number of specific questions. I inquired, among other issues, about the financial status of

---

[3] Three Purdue executives also pled guilty at that time to misdemeanor charges under 21 U.S.C.A. § 333(a)(1) (West 1999).

the corporation, the means employed to calculate recoverable damages, and the effect the agreement might have on the ability of affected persons to recover individual damages. Ultimately, I accepted the Plea Agreement over the objections of certain putative victims of the crime, finding that it imposed adequate punishment on the defendant. *United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 576-77 (W.D. Va.), *mandamus denied*, 264 F. App'x 260 (4th Cir. 2007) (unpublished).

A final criminal Judgment was entered on July 25, 2007, in which Purdue was adjudicated guilty of the felony charged in the Information and placed on probation for a term of five years. As a condition of that probation, Purdue was ordered to pay the financial sanctions set forth in the Plea Agreement.

Medicaid was among the governmental health care programs the United States claimed had suffered loss on account of Purdue's conduct. Medicaid is a cooperative venture of the federal government and the states that pays for medical care for lower-income persons. When a Medicaid claim is filed, the state initially pays the entire cost to the medical provider. The federal government must then reimburse each participating state on a quarterly basis "an amount equal to the Federal medical assistance percentage . . . of the total amount expended during such quarter as medical assistance under the State [Medicaid] plan." 42 U.S.C.A. § 1396b(a)(1) (West 2012). The federal medical assistance percentage ("FMAP"),

which is set periodically and varies by state, is the percentage reimbursement the state will receive for its Medicaid expenditures. 42 U.S.C.A. § 1396d(b) (West 2012 & Supp. 2013); *see* Federal Financial Participation in State Assistance Expenditures, 77 Fed. Reg. 71420-02 (Nov. 30, 2012) (fixing FMAP for each state for period October 1, 2013, through September 30, 2014). For a state in which the FMAP is 70 percent, therefore, the federal government will reimburse 70 cents of every dollar the state spends on Medicaid.

In recognition of Medicaid's cost sharing structure, the Civil Settlement Agreement required Purdue to place $60 million in escrow for those states wishing to settle claims against Purdue. Forty-nine states opted into the settlement, each receiving a distribution from this fund in satisfaction of any claims that state might have had against Purdue for its share of Medicaid expenditures that resulted from the fraudulent marketing and promotion of OxyContin.

The Commonwealth was the only state that chose to opt out of the settlement. Instead, on October 4, 2007, the Attorney General, together with Pike County, filed suit[4] in the Circuit Court of Pike County, Kentucky (the "State Court

---

[4] In addition to the defendant in this case, the State Court Action names as defendants Purdue Pharma, Inc., Purdue Pharmaceuticals, L.P., and P.F. Laboratories, Inc. The defendant represents that these entities are affiliates of the Purdue Frederick Company, Inc. and are also entitled to injunctive relief. The State Court Action also names two unaffiliated defendants, Abbot Laboratories and Abbott Laboratories, Inc.

Action").[5]  The factual foundation for the State Court Action is the same as in the United States' prosecution of Purdue.  In fact, the Attorney General attached the Agreed Statement of Facts to his First Amended Complaint in the State Court Action.  As in this case, the central allegation in the State Court Action is that:

> Beginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin to medical care providers as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications. . . .

(Purdue's Brief in Supp., Ex. F ¶ 42.)

The Attorney General emphasizes in his First Amended Complaint in the State Court Action that the Commonwealth "is responsible for the costs of prescription, health care and medical costs for Medicaid recipients pursuant to the State Medicaid Program and statute administered by the Kentucky Cabinet for Health and Family Services."  (*Id.* at ¶ 106.)  He alleges that Kentucky's Medicaid

---

[5] Although the State Court Action was filed nearly six years ago, little substantive progress has been made in the litigation.  After it was filed, Purdue removed the case to a federal district court in Kentucky.  The case was then transferred, consolidated, and stayed as part of on-going multidistrict litigation in the Southern District of New York. That court, concluding the case had been improperly removed, remanded the case to the Kentucky state court on September 26, 2011.  *Kentucky ex rel. Conway v. Purdue Pharma, L.P. (In re OxyContin Antitrust Litigation)*, 821 F. Supp. 2d 591, 603 (S.D.N.Y. 2011).  Purdue then petitioned for leave to appeal and the Second Circuit stayed the remand order pending its decision on the petition.  On January 9, 2013, the Second Circuit denied Purdue's petition, and the case was returned to the Pike County Circuit Court.  *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 220-21 (2d Cir. 2013).  That decision obviously prompted the present motion.

program has spent "millions of dollars each year to pay for excessive prescriptions costs, health care and medical costs and to provide necessary services and programs on behalf of indigents and other eligible citizens who have used or will use OxyContin and have suffered or will suffer deleterious health effects therefrom." (*Id.* at ¶ 87.) The Attorney General specifically alleges that between 1998 and the first quarter of 2006, the Kentucky Medicaid program spent over $22 million paying for OxyContin prescriptions.

Seeking reimbursement for these Medicaid expenditures, the Attorney General's First Amended Complaint states claims for violations of the Kentucky Medicaid Fraud Statute and the Kentucky False Advertising Statute. The Attorney General also asserts state law claims for disgorgement, continuing public nuisance, unjust enrichment, indemnity, negligence, antitrust, fraud, conspiracy, and punitive damages. None of these claims specify the amount of damages owed to the Commonwealth. In his prayer for relief in the First Amended Complaint, however, the Attorney General requests "restitution and reimbursement sufficient to cover all prescription costs the Commonwealth has incurred related to OxyContin due to Defendants' wrongful conduct, with said amount to be determined at trial." (*Id.* at ¶ H.)

In its initial filing regarding its motion for an injunction, Purdue argued that the Attorney General was seeking to recover all prescription drug costs and other

monies the Kentucky Medicaid program expended as a result of Purdue's conduct in marketing OxyContin. According to Purdue, this amount included the roughly 70 percent of Kentucky's Medicaid expenditures for which the state has already received reimbursement from the federal government. Ordinarily, a state may pursue clams in which both the state and federal government have an interest, so long as the state remits to the federal government the percentage of any monetary damages recovered for which the state received reimbursement. *See* 42 U.S.C.A. § 1396k(d) (2012). In this case, however, the federal government has already released any claim it might have had for damages to the Medicaid program in the Civil Settlement Agreement.

Purdue expresses concern that the State Court Action threatens to unsettle the complex disposition the parties negotiated in this case by allowing the Attorney General to relitigate in state court claims that have already been resolved. The Attorney General has since made clear, however, that he does not seek to recover any damages beyond those directly incurred by the Kentucky treasury — that is, he does not intend to recover the share of the costs to the Kentucky Medicaid program that were paid by the federal government.[6] The Attorney General represents, however, that it will be necessary and appropriate for him to present evidence to

---

[6] "The Commonwealth is not attempting to collect the federal share of Medicaid damages for itself, for the federal government, or for anyone else." (Commonwealth's Sur-Reply 2.)

the court and jury in the State Court Action of the totality of the damages to the Kentucky Medicaid program caused by Purdue's conduct, including evidence of the federal share.

Purdue argues that allowing the Attorney General to conduct discovery of and present this evidence will effectively force it to relitigate claims that it believed were conclusively settled six years ago, forcing it to expend unnecessary resources and damaging its ability to receive a fair verdict at trial. Purdue asks this court to issue, pursuant to the All Writs Act, 28 U.S.C.A. § 1651, a narrowly-tailored injunction designed both to aid this court's jurisdiction as well as to protect and effectuate the outcome the parties negotiated and expected in this case. Specifically, Purdue seeks to enjoin the Attorney General from: (1) pursuing any damages representing the federal share of Kentucky's Medicaid expenses; (2) pursuing any discovery that does not sufficiently exclude the federal share; (3) offering any evidence during trial that does not sufficiently exclude the federal share; and (4) executing any judgment that does not sufficiently exclude the federal share. The Attorney General has responded in opposition to this motion, primarily arguing that an injunction of a state court proceeding under these circumstances would contravene the Anti-Injunction Act, 28 U.S.C.A. § 2283.

Purdue's motion has been the subject of multiple rounds of briefing from both Purdue and the Attorney General, and it has been orally argued. It is ripe for decision.

## II. Applicable Law.

The All Writs Act grants federal courts the authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C.A. § 1651(a). Although this language appears to allow for the exercise of broad judicial discretion, the All Writs Act "has been greatly circumscribed, both by case law and by statute," and "generally should only be used 'sparingly and only in the most critical and exigent circumstances.'" *Gooch v. Life Investors Ins. Co. of Am.* (*In re Life Investors Ins. Co. of Am.*), 589 F.3d 319, 330 (6th Cir. 2009) (quoting *Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 542 U.S. 1305, 1306 (2004) (Rehnquist, C.J., in chambers)).

A court's authority under the All Writs Act is nowhere more limited than when it is asked to enjoin a proceeding in state court.[7] The Anti-Injunction Act

---

[7] In its motion, Purdue seeks to enjoin the Attorney General, rather than enjoining the proceeding itself. Courts have recognized, however, that "[t]he Anti-Injunction Act's prohibition against the enjoining of state proceedings . . . extends to injunctions against parties to the state-court litigation." *Bryan v. BellSouth Commc'ns, Inc.*, 492 F.3d 231, 236 n.2 (4th Cir. 2007); *see also Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398

provides, "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C.A. § 2283. The Anti-Injunction Act "represents Congress' considered judgment as to how to balance the tensions inherent in [the federal] system. Prevention of frequent federal court intervention is important to make the dual system work effectively." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988). The Fourth Circuit "take[s] seriously the mandate in the Anti-Injunction Act and recognize[s] that for over two hundred years, the Act has helped to define our nation's system of federalism." *Emp'rs Res. Mgmt. Co. v. Shannon*, 65 F.3d 1126, 1130 (4th Cir. 1995); *see also Denny's Inc. v. Cake*, 364 F.3d 521, 531 (4th Cir. 2004) ("[T]he basic harm the statute was intended to prevent was not the liberal granting of protective orders, *per se*, but the needless friction between state and federal courts.") (internal quotation marks and citation omitted).

The Anti-Injunction Act categorically prohibits injunctions of state court proceedings "unless [the injunction] falls within the reach" of one of the three specific exceptions outlined in the Act. *Bryan*, 492 F.3d at 236; *cf. Nationwide Mut. Ins. Co. v. Burke*, 897 F.2d 734, 737 (4th Cir. 1990) ("Before a federal court

---

U.S. 281, 287 (1970) ("It is settled that the prohibition of § 2283 cannot be evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding.").

may enjoin a state court proceeding, the injunction must be based upon one of §
2283's three narrow exceptions.")  Moreover, notions of comity between federal
and state courts require that these "exceptions should not be enlarged by loose
statutory construction."  *Atl. Coast Line R.R.*, 398 U.S. at 287.  In this case, no
argument has been made that the first exception to the Anti-Injunction Act applies;
that is, there has been no argument that Congress has specifically authorized
federal courts to enjoin the proceedings of state courts under these circumstances.
Purdue does contend, however, that both the second and third exceptions apply in
this case.  Purdue argues that the injunction it requests is necessary both to aid this
court's jurisdiction and to protect and effectuate the judgment entered in this case
six years ago.  I will address these arguments in turn.


III. THE RELITIGATION EXCEPTION.

The Anti-Injunction Act provides that a federal court may enjoin the
proceedings of a state court "to protect or effectuate its judgments."  28 U.S.C.A. §
2283.  Courts often refer to this exception to the general prohibition against
injunctions of state court proceedings as the "relitigation exception."  "'The
relitigation exception was designed to permit a federal court to prevent state
litigation of an issue that previously was presented to and decided by the federal
court.  It is founded in the well-recognized concepts of res judicata and collateral

estoppel.'"  *Bryan*, 492 F.3d at 236 (quoting *Chick Kam Choo*, 486 U.S. at 147).

For a federal court to justify enjoining state proceedings under this exception, "the

issue the federal court decided must be the same as the one presented in the state

tribunal," and the party to be enjoined "must have been a party to the federal suit,

or else must fall within one of a few discrete exceptions to the general rule against

binding nonparties." *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2376 (2011).

The Supreme Court has not specifically defined the degree to which the

scope of the exception tracks the scope of preclusion.  "[M]ost federal court apply

the relitigation exception far more narrowly than the doctrine of res judicata, more

in line with collateral estoppel."  17A James Wm. Moore, *Moore's Federal

Practice* ¶ 121.08[2][d] (3d ed. 2013).  The Fourth Circuit agrees:

> An injunction may issue under the relitigation exception only if the
> claims or issues subject to the injunction have actually been decided
> by the federal court; the exception is inapplicable where an injunction
> is sought to prevent the litigation of claims or issues that *could have*
> been decided in the original action but were not.

*Bryan*, 492 F.3d at 236-37 (emphasis in original); *see also LCS Servs., Inc. v.

Hamrick*, 925 F.2d 745, 750 (4th Cir. 1991) ("The district court did not directly

address any issue presently pending before the state court.  Accordingly, we find

that the relitigation exception . . . does not apply. . . ."); *Nationwide*, 897 F.2d at

737 ("[T]he federal court must actually have decided the claims or issues which the

federal injunction would insulate from state proceedings.").   In light of the

circumscribed nature of this exception, a complainant who seeks to invoke it "must make a strong and unequivocal showing of relitigation of the same issues." *LCS Servs.*, 925 F.2d at 749 (internal quotation marks and citations omitted). This approach to applying the relitigation exception is consistent with the Supreme Court's recent characterization of the use of the exception as "resorting to heavy artillery." *Smith*, 131 S. Ct. at 2376. "For that reason, every benefit of the doubt goes toward the state court; an injunction can issue only if preclusion is clear beyond peradventure." *Id.* (internal citation omitted). Therefore, in order for Purdue to demonstrate that an injunction should be issued under these circumstances, it must show that the issues it seeks to enjoin from consideration by the state court were actually decided by this court, and that the Attorney General fits into one of the exceptions allowing for preclusion of nonparties.

First, I cannot conclude that the issues with regard to which Purdue seeks an injunction were properly litigated and decided in this court such that I should enjoin the proceedings of the state court. In light of the Attorney General's representation that he will not seek to recover any damages that have already been recovered and released by the federal government, the key claim Purdue was concerned it would have to relitigate is no longer an issue. Ultimately, therefore, Purdue is seeking an injunction of a state court's ability to proceed on a claim the plaintiff in state court has specifically denied having any intention to seek. The

conclusion is inescapable, therefore, that the claim before the state court is not the same as that which was resolved in this case.

This conclusion is further supported by the fact that all of the causes of action alleged in the State Court Action arise under state statutory and common law. Although the state's Medicaid program is certainly governed by and subject to federal laws and regulations, I hesitate to conclude that any resolution under federal law necessarily defined the related rights of a state as a matter of state law. *Cf. Atl. Coast Line R.R.*, 398 U.S. at 289 (concluding that a prior federal court order focused only on the application of federal law and therefore could not justify an injunction of a contradictory state court order where the state court had ruled as a matter of state law); *Smith*, 131 S. Ct. at 2379 ("A federal court and a state court apply different law. That means they decide distinct questions. The federal court's resolution of one issue does not preclude the state court's determination of another. It then goes without saying that the federal court may not issue an injunction. The *Anti*-Injunction Act's *re*-litigation exception does not extend nearly so far.") (emphasis in original).

Nonetheless, Purdue still requests the court to foreclose any attempt by the Attorney General to seek or execute a judgment containing an award of damages that have already been recovered by the federal government, as well as any attempt to discover or present evidence at trial relevant to those released claims. Purdue

contends that an injunction of discovery and evidentiary matters is necessary to protect and effectuate the outcome in this case. According to Purdue, allowing the Attorney General to present evidence of the federal share to a jury in state court could subject Purdue to an unduly large punitive damages award impermissibly premised on claims or behavior that is not at issue in that case. Purdue argues that it would be forced to relitigate the federal claims in order to avoid such an award, as well as to rebut the threat of additional and unfair harm to its public reputation.

The Third Circuit rejected a similar argument in *Drelles v. Metro. Life Ins. Co.*, 357 F.3d 344 (3d Cir. 2003). In that case, a defendant in a complex multidistrict litigation ("MDL") matter sought to enjoin the plaintiffs in a number of parallel state court actions from discovering and presenting evidence of damages encompassed by the nationwide MDL. *Id.* at 345. These plaintiffs had opted out of the MDL settlement. The defendant argued that allowing the state plaintiffs to introduce this evidence would force it to relitigate the settled claims. The Third Circuit disagreed:

> [The plaintiffs], however, are not relitigating the settled claims at all here; they are suing over their own alleged mistreatment at the hands of Metlife, not over someone else's claim. Metlife observes that [the plaintiffs'] complaint largely copies the class action complaint in the MDL case and describes at length the allegations against Metlife in the MDL case. To the extent that [the plaintiffs] may try to bring in evidence of nationwide practices that are irrelevant to their individual claims, however, Metlife is free to object to such evidence before the appropriate state courts, who are the proper authorities to make such evidentiary rulings.

*Id.* at 346-47.

In this case, the Attorney General is seeking to litigate the Commonwealth's "own alleged mistreatment" at the hands of Purdue. Similar to the Third Circuit case, Purdue has argued that the nearly identical nature of the complaint in the State Court Action when compared to the Agreed Statement of Facts illustrates that it will be forced to relitigate claims it has already settled, even if it will not ultimately be subject to paying damages again on those claims. The fact that the claims arise from the same conduct as was at issue in this case, however, does not change the fact that they are specific claims belonging to the Commonwealth, none of which were addressed in this case. The evidentiary matters Purdue seeks to enjoin should be decided as a matter of the state court's rules of civil procedure and evidence. This court certainly has not determined the preclusive or evidentiary import of the outcome of this case under Kentucky law, and I must remain mindful that "the Supreme Court has limited the relitigation exception to the precise language of the district court's prior order . . . ." *LCS Servs.*, 925 F.2d at 749-50. For these reasons, I do not believe that Purdue has made a "strong and unequivocal showing" that the State Court Action threatens relitigation of any issues that were directly addressed in this case.

In addition, although I do not decide this issue, I am not convinced that the Attorney General is subject to any of the exceptions that would allow for the

application of preclusion principles to him despite not being a party to the prior litigation. The Supreme Court has "repeatedly 'emphasize[d] the fundamental nature of the general rule' that only parties can be bound by prior judgments; accordingly, [it has] taken a 'constrained approach to nonparty preclusion.'" *Smith*, 131 S. Ct. at 2379 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 898 (2008)).

Purdue has argued, with some merit, that the statutory scheme creating the Medicaid program imposes a form of agency relationship between the federal government and each of the states.[8] The fact remains, however, that the Attorney General is a representative of a sovereign state whose decision not to participate in the global settlement was both anticipated in the terms of that agreement and protected by law. The Attorney General may decide independently of the federal government, even under the current statutory scheme, when and where to pursue claims for damages to the Medicaid program. Moreover, it is clear that the Commonwealth had no involvement in the grand jury investigation of this criminal case. The Seventh Circuit has determined that this is an important factor in deciding whether preclusion principles should be applied. *See Kerr-McGee Chem.*

---

[8] 42 U.S.C.A. § 1396a(a)(25) (West 2012) imposes on each state or local administering agency an obligation to "take all reasonable measures to ascertain the legal liability of third parties" with regard to the payment of Medicaid funds, and where such liability is found to exist, to "seek reimbursement . . . to the extent of such legal liability." Congress then required the states to arrange for "appropriate reimbursement of the Federal Government" whenever a state recovers funds from a party improperly paid. 42 U.S.C.A. § 1396k(b) (West 2012).

*Corp. v. Hartigan*, 816 F.2d 1177, 1181 (7th Cir. 1987) ("Although a nonparty may be bound because of the control that it exerts over litigation, the degree of control justifying preclusion of a nonparty should be enough that the nonparty has the actual measure of control or opportunity to control that might reasonably be expected between two formal coparties.") (internal quotation marks and citation omitted).

As the Third Circuit stated in *Drelles*, "Allowing the preemptive approach espoused . . . here would essentially nullify [the] decision to opt out. . . ." 357 F.3d at 346-47. Although federal Medicaid laws require states to act on behalf of the federal government at least where it has not already done so itself, I do not believe the Attorney General can properly be characterized as "so closely aligned with" the interests of the United States under the facts of this case "as to be [its] virtual representative." *Kerr-McGee*, 816 F.2d at 1180. The federal government has already asserted its claim, leaving Kentucky to pursue its own remedy. The relitigation exception, therefore, should not be applied to the claims the Attorney General is litigating on behalf of the Commonwealth in the State Court Action.

An additional factor that counsels against enjoining the State Court Action pursuant to the relitigation exception is the nature of the judgment entered in this criminal case. As with most criminal cases, the only judgment I entered was one finding that Purdue was guilty of the crime with which it was charged and

imposing the appropriate punishment. As detailed above, I did inquire into the terms of the Plea Agreement solely in order to determine whether the agreed disposition of the charge adequately represented the factors that I must consider in sentencing criminal defendants who have been found guilty. *See* 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2013). I entered no other orders regarding the relative liabilities of the United States and Purdue, nor did I adopt or approve the Civil Settlement Agreement as part of any order or judgment of this court. I did require as a condition of probation that Purdue pay the financial sanctions imposed in the Plea Agreement, but that order did not imply adoption of the terms of the Civil Settlement Agreement.

For example, had the United States not acted in conformity with the terms of the Civil Settlement Agreement, I would not have been able to enforce compliance by a sanction of contempt of court. Because no order was ever entered adopting this settlement, the Civil Settlement Agreement is simply a contract between the United States and Purdue, for the breach of which the parties may resort to traditional contract remedies. For these reasons, I question whether the terms of the civil settlement between the United States and Purdue have the quality of a court judgment that can be protected and effectuated by an injunction issued pursuant to the relitigation exception.

These doubts further counsel against entering such an injunction under this exception to the Anti-Injunction Act.

## IV. AID OF JURISDICTION EXCEPTION.

The other exception to the Anti-Injunction Act allows a federal court to enjoin the proceedings of state courts "when necessary in aid of its jurisdiction." 28 U.S.C.A. § 2283. Historically, courts have understood this exception "to apply most often when a federal court was the first in obtaining jurisdiction over a *res* in an *in rem* action and the same federal court seeks to enjoin suits in state courts involving the same *res*." *Miller v. Brooks* (*In re Am. Honda Motor Co. Dealerships Relations Litig.*), 315 F.3d 417, 439 (4th Cir. 2003). Unlike in personam actions, in which state and federal courts may separately impose judgments and obligations on litigants, the imposition of conflicting obligations on property is impossible to administer, necessitating that only one court decide the appropriate allocation of rights with regard to that property.

A number of courts have recognized that this exception can apply with equal or even greater force to a federal court's disposition of complex litigation. *See, e.g., In re Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 725 (E.D. La. 2012) ("In the context of complex multidistrict litigation, the distinction drawn by the Supreme Court between an *in rem* and *in personam* proceeding for purposes of

applying the necessary in aid of jurisdiction exception is not so delineated."). The expenditure of judicial resources required to administer such large and complex cases involving hundreds of parties can effectively transform the orderly disposition of such a case into a *res* requiring injunctive protection to preserve the court's ability to facilitate a global resolution of the case. *Id.* at 726. If a state court were to attempt to assert jurisdiction over any of the same claims at issue in the complex federal case, it may "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atl. Coast Line R.R.*, 398 U.S. at 295.

The Fourth Circuit is among the courts to have determined that this exception can be appropriately applied to protect the court's consideration and disposition of complex litigation. In *Miller v. Brooks* the court concluded that the district court had appropriately enjoined proceedings in a California state court in order to protect its jurisdiction over the settlement agreement reached in the MDL over which it had presided. 315 F.3d at 439. The plaintiffs in the California state court had joined the settlement of the MDL in federal court, but then proceeded to file an action in state court seeking to recover damages from their former attorney whose malpractice had allegedly deprived them of the opportunity to recover for additional claims that fell outside the terms of the MDL settlement agreement. Noting that the plaintiffs' claims inevitably would require the state court to

interpret the scope of the settlement agreement, the Fourth Circuit concluded that it would be appropriate for the district court to enjoin the state proceeding to protect its jurisdiction over the agreement. The court emphasized that the district court had expressly retained "exclusive jurisdiction" regarding the agreement's "implementation, interpretation and enforcement." *Id.* at 432. An additional factor the court cited was its belief that the state court plaintiffs had been disingenuous and were unjustly attempting to abuse the MDL process of the court. *Id.* at 439. The Fourth Circuit concluded that allowing a party to a federally-administered MDL settlement to enjoy the benefit of the settlement while simultaneously attempting to avoid the limitations imposed by the scope and finality of that agreement "threatened to frustrate multi-district litigation proceedings and disrupt the orderly resolution of those proceedings." *Id*. at 440.

The Fourth Circuit's approach to evaluating a district court's decision to issue injunctions in aid of its jurisdiction in the context of complex litigation is a common one.

> First, we look to the nature of the federal action to determine what kinds of state court interference would sufficiently impair the federal proceeding. Second, we assess the state court's actions, in order to determine whether they present a sufficient threat to the federal action. And finally, we consider principles of federalism and comity, for a primary aim of the Anti-Injunction Act is "to prevent needless friction between the state and federal courts."

*In re Diet Drugs*, 282 F.3d 220, 234 (3d Cir. 2002) ("*Diet Drugs I*") (quoting *Okla. Packing Co. v. Okla. Gas & Electric Co.*, 309 U.S. 4, 9 (1940)).

In finding that the nature of a federal suit rendered it susceptible to disruption or disturbance by an action in state court, courts have generally emphasized six common factors: (1) the complex MDL or class action structure of the case; (2) whether the district court expressly retained jurisdiction over the settlement; (3) whether and at what point the state court plaintiffs were party to and opted out of the federal action; (4) whether the court perceives the state court plaintiffs to be abusing the process of the court; (5) the extent of judicial resources expended in managing the federal action; and (6) the stage of negotiation or settlement the federal action had reached at the time an injunction of the state action is sought.

First, federal courts handling in personam cases have generally limited their decisions to enjoin state court proceedings to MDLs or complex national class actions. "Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction." *Diet Drugs I*, 282 F.3d at 235. In fact, several courts have declined to enjoin state court proceedings specifically because the federal action did not involve an MDL

or a certified class action. *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1103 (9th Cir. 2008) (holding that an injunction was inappropriate because "[t]his was not an MDL case; discovery was not complete; no class settlement was imminent, in fact, as far as the record shows no serious settlement progress had been made. . . ."); *Gooch*, 589 F.3d at 330-31 (declining to enjoin state court proceedings because the federal action did not involve an MDL or class action).

The Ninth Circuit approved of a district court's injunction of state court proceedings outside of the context of an MDL or class action, one of only a few such cases, in *Flanagan v. Arnaiz*, 143 F.3d 540 (9th Cir. 1998). In that case, a regulatory agency had ordered that a bank disentangle its affairs from those of one of its founders and substantial shareholders. *Id.* at 542. The difficulties associated with completing the ouster led the parties to enter into a complex settlement agreement, subject to the court's approval. *Id.* The ousted former shareholder subsequently filed an action alleging breach of the agreement in state court. The district court enjoined the state court action, and the Ninth Circuit approved. Although the case was not an MDL or class action, it did involve another factor courts have consistently looked to in deciding to enjoin state proceedings. In the consent order it signed approving the settlement, the district court had expressly retained jurisdiction for purposes of resolving future disputes arising from the agreement. *Id.* at 543. "Where the district court expressly retains jurisdiction to

enforce a settlement agreement, and to resolve disputes that may arise under it, litigation in state court would pose a significant risk of frustrating the district court's jurisdiction over the consent judgment." *Id.* at 545 (internal quotation marks and citation omitted).

Other federal courts have similarly found this retention of jurisdiction to support the issuance of an injunction. *See, e.g.*, *In re Diet Drugs*, 369 F.3d 293, 300 (3d Cir. 2004) ("*Diet Drugs II*") (finding that the district court's express retention of jurisdiction supported an injunction).

The third factor many courts have considered is whether, and at what point in the progress of the case, the plaintiffs in state court elected to opt out of the federal action in order to pursue their own remedy. The effect of a state court plaintiff's "opt out" status, however, is not unambiguous. Under some circumstances, courts have found that allowing an ex ante injunction of state court proceedings "would essentially nullify [the state court plaintiff's] decision to opt out." *Drelles*, 357 F.3d at 346-47.

More frequently, however, courts have found that a plaintiff's decision to opt out of a class after certain progress had been made in the federal litigation made the issuance of an injunction of the state court's ability to consider certain issues more appropriate. For example, in *In re Prudential Ins. Co. of Am. Sales and Practice Litig.*, 261 F.3d 355 (3d Cir. 2001), the court held that an injunction

was appropriate where members of the federal class action chose to remain part of the settlement for purposes of resolving their claims regarding two of their covered insurance policies, but chose to opt out of the settlement with regard to two other insurance policies. The court concluded that the state court plaintiffs should be "precluded from using the sales practices and factual predicates pertaining to their Class Policies in their state court action on the Excluded Policies." *Id.* at 367. The court decided that allowing plaintiffs to take advantage of the full scope of facts in both state and federal court would "undermine the possibility for settling any large, multi district class action," leaving defendants in those actions perpetually "concerned that a settlement of the federal class action would leave them exposed to countless suits in state court despite settlement of the federal claims." *Id.*; *accord*, *Diet Drugs II*, 369 F.3d at 296 (approving an injunction of certain evidentiary issues in a state court action brought by individuals who had opted out of a class action in federal court after the litigation had reached an "intermediate" stage).

The fourth factor that many courts, including the Fourth Circuit, have considered is whether the state court plaintiff has exhibited any bad faith with regard to the federal action. In *Miller v. Brooks*, the Fourth Circuit held, among other things, that the district court did not abuse its discretion in enjoining a state court proceeding "to rectify the injustice [it] found [the plaintiffs] had perpetrated

by engaging in misconduct in order to defeat such jurisdiction." 315 F.3d at 437; *accord*, *Diet Drugs II*, 369 F.3d at 301 (district court's finding that plaintiff's counsel had showed bad faith and conduct supported injunction).

Among the other factors courts have emphasized is the expenditure of judicial resources in the federal action. The Fifth Circuit articulated how this factor weighed on its decision to enjoin state court proceedings in *Newby v. Enron Corp.*, 338 F.3d 467, 469 (5th Cir. 2003). "The district judge presiding over these cases has ruled on numerous motions and has been heavily engaged in the considerable task of managing this complex litigation, including issuing a comprehensive pre-trial scheduling order." *Id.* The court further noted that the federal action involved a large number of civil cases combined into one proceeding, and that the state court was attempting to issue orders that were duplicative of orders from the district court, thereby multiplying the cost of litigating what was already a burdensome case. *Id.* at 474-75.

Other courts have similarly emphasized the expenditure of judicial resources and the complexity of actions in justifying the issuance of an injunction. *See, e.g.*, *Diet Drugs I*, 282 F.3d at 236 (noting that the case represented the consolidation of two thousand individual suits, comprised six million class members, and necessitated the entry of over one thousand judicial orders over the course of two years in order to reach a settlement approved by the district court); *In re Vioxx*

*Prods. Liab. Litig.*, 869 F. Supp. 2d at 721 (observing that the court had decided over one thousand discovery motions and conducted six bellwether trials in order to facilitate a global settlement of the remaining claims in the MDL).

The final factor that has been commonly considered by courts deciding whether to enter injunctions in aid of their jurisdiction accounts for the progress the court and parties have made in settling the case in federal court. Generally, courts have found injunctions of state court proceedings to be more necessary when the case has achieved or is very near to a final settlement. Where the parties have so far developed their expectations as to the likely disposition of a case, a state action that would attempt to address the same claims or issues in a contrary fashion may "so interfere[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexability and authority to decide that case." *Atl. Coast Line R.R.*, 398 U.S. at 295.

For example, in *Carlough v. Amchem Products, Inc.*, 10 F.3d 189, 204 (3d Cir. 1993), the Third Circuit observed that the institution of litigation at a very late stage in the federal action could so disrupt the process of negotiating a settlement agreement as to effectively interrupt the federal court's jurisdiction. "At this mature phase of the settlement proceedings and after years of pre-trial negotiation, a mass opting out of [the state court plaintiffs] clearly would be disruptive to the

district court's ongoing settlement management and would jeopardize the settlement's fruition." *Id.*

The Second Circuit has also concluded that where the federal action has progressed to a point at or near settlement, it is especially deserving of injunctive protection to preserve the district court's jurisdiction:

> The success of any federal settlement was dependent on the parties' ability to agree to the release of any and all related civil claims the plaintiffs had against the settling defendants based on the same facts. If states or others could derivatively assert the same claims on behalf of the same class or members of it, there could be no certainty about the finality of any federal settlement. Any substantial risk of this prospect would threaten all of the settlement efforts by the district court and destroy the utility of the multidistrict forum otherwise ideally suited to resolving such broad claims.

*In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985). As Judge Fallon stated in the *Vioxx* case, if state court proceedings "can functionally interfere with or unsettle a completed settlement, years after all parties involved considered the claims to be concluded, it would have a chilling effect on future settlements and interfere with" the court's ability to "foster efficient global resolutions in complex multidistrict litigation." *Vioxx*, 869 F. Supp. 2d at 728.

Considering all of these factors, Purdue has not demonstrated that an injunction is necessary in aid of this court's jurisdiction in this case. Purdue argues that this case, although not an MDL or class action, is a form of complex litigation similar to those types of cases. I agree that the five-year grand jury investigation

and the agreement reached between these parties was complex — that much is clear from the Agreed Statement of Facts and the Civil Settlement Agreement. Nonetheless, the structure of this criminal case is not. This action involves only one case, not a consolidation of many cases, and only two parties, the United States and Purdue.[9] As a result, many of the most difficult issues, as well as the expenditure of judicial resources, that justified the issuance of injunctions in those types of cases were simply not present in this case.

Unlike the *Vioxx* case, in which Judge Fallon had to rule on hundreds of discovery motions and conduct six trials in order to facilitate settlement negotiations, the parties in this case came before the court having negotiated their own settlement and requiring only the court's approval of Purdue's guilty plea.[10]

Purdue has also argued that this court expressly retained jurisdiction over this case by accepting Purdue's guilty plea, which Purdue believes incorporated the Civil Settlement Agreement. As I explained above, I do not believe that my

---

[9] Purdue appears to argue that this case, at least in form if not in fact, operated like a class action because each of the states was also a plaintiff. I cannot agree. Although forty-nine of the states ultimately chose to take advantage of the terms of the settlement negotiated between the government and Purdue in this case, only Virginia was an actual participant in the settlement. The United States was not purporting to represent a "class of states" in its action here; it was prosecuting a violation of federal law.

[10] I do not mean to suggest that the means the parties employed in this case in reaching their settlement are less deserving of respect and protection than is the case when the court has been deeply involved throughout the litigation; I only believe that such a case does not threaten the integrity of the court's "jurisdiction" to the same degree for purposes of the Anti-Injunction Act.

judgment finding Purdue guilty of violating federal law necessarily also functioned as an order directing that the parties comply with the Civil Settlement Agreement. The parties did include a provision in that agreement requiring the parties to submit resolution of any future disputes to this court. In light of the absence of an order from this court, however, this provision was simply a contractual forum selection clause, rather than an express reservation of jurisdiction.

Moreover, although the Commonwealth elected not to participate in the civil settlement provided for the states, I do not believe this factor weighs in favor of an injunction of discovery and evidentiary proceedings in the State Court Action. Unlike the state court plaintiffs in *Diet Drugs II* or *In re Prudential*, the Attorney General was at no time involved in this criminal prosecution. The Commonwealth has in no way acted in bad faith or taken any actions that should prejudice its ability to litigate the claims it has alleged in the State Court Action.

Finally, Purdue has argued that the State Court Action threatens to disrupt the settlement of a claim that was conclusively addressed six years ago. Purdue argues that this factor should weigh heavily in favor of an injunction, because a state court action that threatens to unsettle a federal judgment on which the parties have relied for so long could disrupt the federal court's ability to administer this type of complex settlement generally. Quoting from the *Vioxx* opinion, Purdue asserts that "Federal courts need and have the authority to enjoin state-court

litigation that interferes with the ability to shepherd those settlements. Parallel state court litigation that nominally pursues separate claims but functionally would require Defendants to pay twice . . . would severely hinder the incentive to settle, to the detriment of all involved." *Vioxx*, 869 F. Supp. 2d at 729-30.

While I agree with the court in *Vioxx* that parties to complex negotiated settlements should be able "to rely on the peace they have bought," *id.* at *729*, I believe that Purdue has been able to do just that to the degree reasonably expected. Upon entering its guilty plea, Purdue could reasonably anticipate having to complete a term of probation, including all of the conditions of that probation, supervised by this court. Purdue could also reasonably expect the United States and each of the 49 states opting into the settlement to abide by the terms of their agreements with Purdue. Each of these expectations has been fulfilled, and Purdue has been discharged from its probation. Given this court's inability to compel all of the states to join in a global settlement of their claims against Purdue, as well as the total absence of any private third party payors at all from any participation in this case, it would be unreasonable for Purdue to expect that it "bought" total immunity from having to litigate in the future any claims involving facts similar to those that were resolved in this case.

Purdue has not demonstrated how the State Court Action could threaten this court's jurisdiction, the imposed sentence having been fully served and all parties

discharged from any additional obligations. For these reasons, and keeping in mind that an injunction must be *necessary* in aid of the court's jurisdiction and not merely "related to that jurisdiction," *Atl. Coast Line R.R.*, 398 U.S. at 295, I do not believe that a threat exists to the integrity of this court's jurisdiction such that any injunction of the proceedings in Pike County should issue.

## V. EQUITABLE CONSIDERATIONS.

I have outlined above the reasons why neither exception to the Anti-Injunction Act encompasses the circumstances presented in this case. However, even were this case to involve the entry of a judgment or the exercise of jurisdiction that could be protected by an injunction, a number of equitable considerations further counsel against such an order.

The Supreme Court has made clear that an injunction should only issue under the All Writs Act if it is "otherwise proper under general equitable principles." *Atl. Coast Line R.R.*, 398 U.S. at 287. The Fourth Circuit has also observed that the district court must exercise discretion in deciding whether to enjoin the proceedings of a state court. *Bryan*, 492 F.3d at 239 ("Although we have concluded that the requirements for application of the relitigation exception have been satisfied, that does not necessarily mean it would be proper to enjoin the state proceedings.") Ultimately, the decision of whether to enter an injunction is a

discretionary one, and "principles of comity, federalism, and equity always restrain federal courts' ability to enjoin state court proceedings." *Diet Drugs II*, 369 F.3d at 306. Courts have generally required that a party seeking a federal injunction of a state proceeding demonstrate that the injunction is necessary to prevent irreparable injury and that no adequate remedy is available at law. *See, e.g.,* Moore, *supra* § 121.09; *see also Goodrich v. Supreme Court of the State of S.D.*, F.2d 316, 317(8th Cir. 1975) (citing *Younger v. Harris*, 401 U.S. 37, 46 (1971)) ("Before exercising its equitable power to enjoin the state proceeding, the District Court must find the plaintiff threatened with great and immediate irreparable injury that cannot be eliminated by his defense to the state proceeding.").

In this case, Purdue has not made a showing of the necessity of an injunction with regard to either of these equitable principles. The Attorney General has made clear that the Commonwealth's goal is not to recover any damages that would, under normal circumstances, accrue to the federal government. Purdue, therefore, is not now, nor can it reasonably anticipate, being subject to multiple or inconsistent obligations with regard to repaying the federal share of these Medicaid expenses. Moreover, as a number of courts have pointed out, if Purdue were to somehow become subject to multiple or inconsistent obligations as a result of the state trial court proceeding, it would have an adequate remedy in seeking relief in the state courts of appeal or even the Supreme Court, if necessary. *See, e.g., Atl.*

*Coast Line R.R.*, 398 U.S. at 296 ("[I]f, because of the [state court's] action, [a party] faced the threat of immediate irreparable injury sufficient to justify an injunction . . ., it was undoubtedly free to seek such relief from the [state appellate courts], and might possibly in certain emergency circumstances seek such relief from this Court as well."); *Kerr-McGee Chem. Corp. v. Hartigan*, 816 F.2d 1177, 1182 (7th Cir. 1987) ("[The defendant] can raise the preemption issue as a defense in the pending state court suit. . . . Relief from error in the trial court, if any, can hopefully be obtained through the state appellate courts and ultimately through appeal to the United States Supreme Court.").

Purdue has argued that the typical remedies available at law, including seeking leave to appeal to the higher state courts, would in this case be inadequate. Purdue believes that the Attorney General's contemplated efforts to discover and present at trial evidence relevant only to the federal share would effectively and inequitably force it to relitigate the already-released federal claims. According to Purdue, the remedy of challenging the orders on appeal is ineffective because, even if any excess of damages were remedied by a judicial setoff following the trial, the the additional cost of defending the claims will already have occurred. Citing the *Vioxx* decision, Purdue, claims that allowing the presentation of evidence regarding the full damages to Medicaid will erroneously inflate the perceived damages to the Commonwealth, which could have business or public relations implications. 869

F. Supp. 2d at 729. Purdue worries it could also be forced to pay attorneys fees based on an inflated damages figure before any set-off by the court. According to Purdue, these threats constitute irreparable injury such that this court should issue an injunction.

Purdue has not explained, however, how these factors demonstrate an inadequate remedy at law. Purdue has not advanced any of these arguments about discovery or the presentation of evidence in the six years that the State Court Action has been pending. Each of these arguments about the relevance of evidence and potential prejudice to Purdue can be answered by the state court under Kentucky law. Similar to Judge Fallon in *Vioxx*, I believe that I am "in no position to review the relevance or admissibility" under state law of the evidence Purdue seeks to enjoin. 869 F. Supp.2d at 729. Unlike Judge Fallon, however, I conclude that the equities involved in this case do not overcome this obstacle.

I agree with the Third Circuit's observation that "practical considerations such as manageability and enforceability" of an order enjoining either discovery proceedings or the introduction of evidence "militate against an order that enmeshes a district court in protracted micromanagement of litigation in a state court." *Diet Drugs II*, 369 F.3d at 297-98. Although this type of extensive federal involvement may be advisable in a case involving a complex multidistrict mass tort class action and a parallel state court class action, I do not believe that such

involvement, or even creating the potential for such involvement, would be advisable here.  Purdue requests a narrow injunction of a few aspects of the state court proceeding, but ultimately any order from this court would require interpretation and enforcement issues about which the parties are likely to disagree and in which either party might seek this court's involvement again in the future.

Finally, I must be particularly cautious about enjoining state court proceedings where the state itself is involved as a litigant.  *See* Moore, *supra* ¶ 121.09 ("When a state is significantly involved in a litigation, a litigant seeking to enjoin the proceedings must show the possibility of great and immediate irreparable injury that cannot be eliminated by his defense to the state proceeding."); *accord Goodrich*, 511 F.2d at 317-18 (noting that federal courts should avoid interfering with state court proceedings) (quoting *Douglas v. City of Jeanette*, 319 U.S. 157, 162-63 (1943)).  "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined."  *Healy v. Ratta*, 292 U.S. 263, 270 (1934).  Moreover, the Supreme Court has stated that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed. . . . " *Atl. Coast Line R.R.*, 398 U.S. at 297.

## VI. SUMMARY.

Purdue has not demonstrated that either the relitigation exception or the in-aid-of-jurisdiction exception to the Anti-Injunction Act apply to this case under the circumstances. Given the equities and according proper respect to the principles of comity and federalism that are part of the foundation of our judicial system, the entry of any injunction — even one narrowly-tailored to cover only discovery and evidence in the State Court Action — would be inappropriate. Accordingly, Purdue's motion seeking an injunction will be denied.

A separate order will be entered forthwith.


DATED:  August 5, 2013

/s/  James P. Jones
United States District Judge